NATIONAL AUTO. & CAS. INS. CO.
v. LAYMAN.

No. 10043.

Court of Civil Appeals of Texas.
Austin.

April 23, 1952.

Rehearing Denied May 14, 1952.

Coleman Gay, James H. Rogers, Austin, for appellant.

Jones, Herring & Jones, by Herman Jones, Austin, for appellee.

HUGHES, Justice.

This is a workmen's compensation case in which appellee, Harold Hector Layman, sued for recovery for the loss of sight of his right eye, under Section 12, Art. 8306, V.A.C.S., and in the alternative for recovery for permanent partial incapacity.

Appellee was, at the time of his alleged injury, an employee of Raymond Campi, doing business as Capital Floors, whose insurer was appellant, National Automobile and Casualty Insurance Company.

Based upon jury answers to special issues the trial court rendered judgment for appellee for the loss of the sight of one eye.

The jury made these material findings: (1) That appellee received an injury to his right eye on or about November 27, 1948; (2) that immediately prior to such injury appellee had vision in his right eye; (3) that appellee lost the vision in his right eye as a result of the November 27,1948 injury; and (4) that the condition of appellee's right eye immediately prior to the November 27, 1948 injury was not the sole cause of the loss of vision in his right eye.

In 1948 appellee was 53 years of age. When he was seven years of age his uncle took him into a blacksmith shop where a spark from the anvil flew into his right eye after which time appellee's vision in such eye was greatly impaired.

On or about November 27, 1948, appellee, while laying tile, was struck in the right eye by what he thought to be a sliver of tile. He received medical treatment for this injury, administered by a doctor, for about four weeks following the injury, after which he treated himself to some extent.

The right eye never recovered the normal feeling which it had prior to the November 27, 1948 injury.

In July 1950, appellee, during the night, was seized with a severe and intense pain in his right eye and on the second day thereafter his right eyeball was removed.

Appellant's first two points are to the effect that there is no evidence or insufficient evidence to support the jury finding that appellee had vision in his right eye immediately prior to the 1948 injury.

Appellant concedes that appellee had light perception in his right eye before the injury but, citing Texas Employers' Ins. Ass'n v. Thrash, Tex.Civ.App., 136 S.W.2d 905 (El Paso, writ dism., cor. judgm.), he contends that this is not the "usable vision" required in order to recover for the loss of the sight of an eye under Section 12, supra.

Before appellee's latest injury he could read and perform his work without the use of glasses. At the time of trial he could do neither without wearing glasses.

Appellee testified:

"Q. Describe as best you can what sight, if any, you had out of your right eye before this most recent injury. Tell the jury. A. Well, gentlemen, I could see objects going by. I could see lights in the street. I could see the door, if it was swinging on my side, any object. * * *

"Q. Could you see, out of your right eye only, I mean, could you see persons walk by? A. I couldn't make them out real well, but I could see a shadow, and I could see light of any kind, * * *

"Q. Did you, at your work for Mr. Campi prior to the time of this injury to your eye, did you ever have difficulty in running into doors or other objects on your right side? A. Absolutely, no sir.

"Q. What are the facts in that regard at the present time? A. Well, I just can't make it now. I get tossed around lots of times, objects on that side of me. If there is a closet door swinging, I just go into it. I haven't got any vision at all.

\* \* \* \* \* \*

"Q. Mr. Layman, between the time that you had this spark in your eye when you were a small boy and the time you had this eye injured in 1948, had the condition of your right eye ever handicapped you in the performance of the work that you had done through those years? A. No sir, never.

"Q. What character of work had you done during that period of time? A. A lot of my time I spent on ships and boats. I was in the Merchant Marine. I spent a lot of my time on the water, on boats and ships most of my time.

"Q. And following that time and the time you spent working here in Austin, the sight of your right eye was such as to permit you to perform your duties? A. Yes, sir.

\* \* \* \* \* \*

"Q. Now, state to the jury as best you can, describe what is the difference in the way that you can perform your work now to what it was before your injury. A. When I measure out an area of the floor now, I have to recheck two or three times, because I have to get right down on the floor to see any pencil marks on a pine wood flooring, especially when you lay asphalt tile, and I am just handicapped on sight, because I can't see anymore like I used to.

"Q. Now, can you give any other examples of difficulty that you have now that you didn't experience prior to the injury? A. In this floor covering business you mean?

"Q. Yes. A. For instance, I can take a broom to sweep the floor clean before we lay the tile, and lots of times I will just miss a big place there, and I have got to get down and make sure that I got it all. I never used to have to do those things like that.

"Q. That is with reference to your general eye sight? A. Yes, sir.

"Q. At the present time as compared with before the injury? A. Yes, sir.

"Q. At the present time do you work entirely with your glasses on? A. I can't do anything without them, sir.

"Q. So, compare that as best you can in the performance of your work with what you could do before the injury in 1948. A. Well, if I go to hang a door or take it down, and there is another door swinging right alongside, I have got to go all the way around to see where I am going to put it down there. I can't see no shadow now. I had field vision before. All my life time I had field vision.

"Q. What did you say, field vision? A. Field vision, yes. That is what they told me I had left in my eye. I don't know how big a part it was, but I had vision enough to see you go by, and know you were coming. You wouldn't scare me in the least. I knew you were coming. I could see you."

There is other testimony given by members of appellee's family and business associates corroborating the substance of the evidence given above which we consider unnecessary to relate or copy.

█ Comment on this evidence would add nothing to its weight. We are of the opinion that it is sufficient to support the jury finding that appellee had vision and is sufficient to show that such vision was usable vision.

In fact appellant concedes that:

"It is possible that the record supports the finding of the jury to the effect that plaintiff had 'vision' in his right eye immediately prior to the injury as that term was defined by the Court in its charge to the jury."

We then come to appellant's points three through eight which are grouped for argument. They question, by objections and tendered definitions, the court's definition of the word "vision" in submitting the issue inquiring if appellee had vision in his right eye immediately before the injury. The court gave this instruction:

"You are instructed that the term 'vision' as used in the foregoing issue, is meant such sight as was of some practical benefit to plaintiff in his work."

Appellant objected to the use of the word "some" in such instruction; objected to the issue itself because it inquired only if appellee had vision and did not preface the word "vision" with the word "usable" or "useful"; requested that in lieu of "some" the word "appreciable" or similar adjective be substituted; and appellant requested that the court define "vision" as being the "ability to see as was and would be of practical benefit to the plaintiff in the performance of the duties of his employment and the loss of which vision would impair his ability to perform the duties of his employment" or that "vision" be defined as meaning "such ability to see as was of practical benefit to plaintiff in the performance of the duties of his employment."

The word "practical" means: available, usable, or valuable in practice or action; capable of being turned to use or account; useful. Webster's Int. Dict., 2nd Ed.

█ The word "practical" is a word of common usage, a word the meaning of which is commonly understood and is not such a word as needs defining in a court's charge. By the use of this word the court embodied in his instructions all of the elements which appellant would have supplied by his objections and requests.

We see no real distinction between the words "practical benefit" and "some practical benefit." If there is *any* practical benefit there is *some* practical benefit.

The case of Purchase v. Grand Rapids Refrigerator Co., 194 Mich. 103, 160 N. W. 391, 392 the Supreme Court of Michigan, in sustaining a recovery for loss of an eye, had this to say:

" * * * A mere sightless organ might perhaps be considered no eye at all. Claimant has lost an eye, although an infirm one. It was not wholly useless as an eye. On the contrary, the testimony is that he could with it distinguish light and see approaching objects."

We believe the issue and instruction, as submitted by the trial court, fairly and correctly applied the law concerning the

construction of Section 12, supra. Thrash case, cited above.

Points nine through eleven raise the question of proximate cause, appellant contending that there is no evidence or insufficient evidence to support jury findings that appellee lost the vision of his right eye as a result of the last injury and that there was no evidence to support the jury finding that the sole cause of the loss of appellee's vision in his right eye was not its condition immediately prior to its last injury.

Appellee offered no expert testimony by physicians. Three doctors, all well qualified, testified for appellant.

Dr. Sam N. Key, Sr., first saw appellee as a patient on June 29, 1949, two days before removal of the eye. At that time appellee was in severe pain and, the doctor testified, was suffering with an attack of acute glaucoma in the right eye, the left eye being normal. The right eye was described as being a "degenerated eyeball," a condition which could result in glaucoma.

Dr. Key was unable to find any evidence of a recent injury to appellee's eye and he expressed the opinion that if secondary glaucoma (acute type) was to result from an eye injury it would develop within a short time and not after the lapse of six or seven months. However, on cross examination he was asked "if acute glaucoma could result from a 40 year old injury, it could surely result from a 7 months old injury, couldn't it" and he answered "Why certainly," but restated his former opinion in these words:

"* * * but I think it is probable to assume that if he were going to have glaucoma from the injury he would have had it pretty soon after the accident, and glaucoma he had 7 months later could just as well or better be from an old disease he had in his eye before the accident."

Dr. Palmer Woodson also testified for appellant. He first examined appellee on December 3, 1948, five or six days after the last injury to the eye at the request of Dr. Robison who was leaving town. He observed a scar in the cornea but was unable to give its age. There was also an abrasion of the conjunctiva, the covering around the eye, and this injury could have caused pain. Dr. Woodson treated appellee's eye on the 3rd, 6th and 10th of December and did not thereafter see the patient whom he referred back to Dr. Robison. Dr. Woodson expressed this opinion:

"Q. Was there anything in the condition that you found when you did examine and treat him on these three occasions in early December, 1948, that in your opinion would account for the glaucoma which develeoped in July, 1949? A. The only thing that I did conclude is from what Dr. Robison had mentioned to me, that he had had an increased intra-ocular tension, and that is one reason why I took his intra-ocular tension, was due to the fact that I was advised he had had pain, and had had increased tension in the eye. Any eye of the nature of his where he had—where that appeared, could give you trouble at any time. It could have been an aggravated infection. A blow or anything could have been a factor in causing an acute condition in his eye."

On cross examination he testified:

"Q. * * * Now, in view of the condition of that eye, continual irritation of the eye and pain to the eye in your opinion could have caused the acute secondary glaucoma? A. Continued irritation?

"Q. Yes. A. Could produce secondary—if he had continued irritation. I don't know whether he had continued irritation.

"Q. I understand that, and I don't want you to answer anything you don't know, but I am asking that continued irritation of the eye from the time you saw him until Dr. Key saw him 7 months later could have easily produced an acute secondary glaucoma? A. Yes, it can produce it, but I don't see how a man could go that long with continued irritation to the eye without having some attention

"Q. Now, do you think that that abrasion that you referred to caused some irritation to his eye? A. Certainly it would cause irritation to his eye."

Dr. Chas. F. Pelphrey was a witness for appellant. He is a pathologist and following removal of appellee's eye made a pathological examination of it. He found no foreign substance in the eye and no evidence of recent injury. He expressed this opinion:

"Q. Does pain and irritation of the eye also cause glaucoma? A. Pain is a result of something wrong rather than a cause, and the irritation could be a cause of glaucoma.

* * * * * *

"Q. * * * Now, you stated that in your opinion the eye had been diseased for many months, and that the degeneration was a process that had been going on for many months? A. I would conclude that.

"Q. Of course, I have got to ask you if you consider 7 many? A. I consider 7 many. I couldn't go to 7 months and say whether it was before or shortly after.

* * * * * *

"Q. Now, Dr. Woodson testified that in his opinion the eye was a bundle of dynamite, I believe he stated, and that any injury or irritation to the eye in that state could easily cause this acute secondary glaucoma. Now, then, do you think you can concur in that statement? A. Yes, or stir up a state of chronic glaucoma.

"Q. It could either cause a state of secondary glaucoma or arouse or stir up a chronic glaucoma that might have been in existence at the time of the injury? A. Yes.

* * * * * *

"Q. * * * Now, with reference to the retina, if it had been deteriorated over a period of years but was not continuing, was arrested, whatever term you would like to use, is there a likelihood that the deterioration could be renewed or excited, as you testified a

while ago, by an injury to the eye? A. Yes.

"Q. That is true of all of these organs that we have mentioned in the eye, is it not, that with reference to deterioration or degeneration you could have a complete static condition resulting from some early injury, that it was not continuing, but there was a degeneration there with reference to the retina, the ciliary body and these other organs you have mentioned, and then the injury occur to that eye and the degeneration would be excited and renewed because of that injury; that not only is possible but is quite likely, is it not? A. That is true."

Appellee testified that after he was struck in the right eye by a piece of tile in November 1948 his eye never felt the same as it did before such occurrence, stating that: "It was irritable, and just like a piece of sawdust moving back and forth in my eye and my eye was always watering. It was running down my face the whole day long. It was trinkling down my face like rainwater" and this condition existed between the time of such injury until he suffered the attack of acute glaucoma and the eye was removed.

In our opinion the foregoing evidence is sufficient to support the jury finding of a causal connection between the November 1948 injury and the loss of the eye as well as the finding that the condition of the eye immediately before such injury was not the sole cause of the loss of appellee's eye.

Appellant's next point is that the trial court erred in permitting Dr. Pelphrey to answer a hypothetical question propounded by appellee over his objection that it assumed that appellee suffered continuous pain during the seven months interval between the November 1948 injury and the removal of his eye when such fact was not in evidence.

A similar question had previously been asked Dr. Key and went unanswered after appellant's attorney made this objection:

"We object to that question as including an element about which there

is no testimony at all, a continuous pain for a period of several months. I didn't say anything about it the last time the question was asked, but I recall most of the testimony, and I object to it for that reason."

As a matter of fact a question making a similar assumption had been previously asked and answered by Dr. Key without objection and subsequently a similar question was asked and answered by Dr. Key without objection.

Appellee did testify that his right eye did not "pain" him during this seven months period but he did testify, as set out above, to its unusual feeling and irritation during such period.

When appellee testified that his eye did not 'pain him during this period he must have had in mind the excruciating pain which he suffered with the attack of acute glaucoma, a pain which Dr. Key described as being one of the three most severe pains known and one which, unless speedily relieved, will cause death, because it is inconceivable that an eye with the feeling of sawdust in it and which continually waters is not painful in the ordinary understanding of the term.

Under these circumstances we conclude that reversible error is not shown by the point under review.

The jury answered "Yes" to the following special issue:

"Do you find from a preponderance of the evidence that Plaintiff lost the vision in his right eye, if any, as a result of the injury thereto on or about November 27, 1948, if any?"

Appellant objected to the form of this issue on the ground that the word "natural" should have been inserted before the word "result."

In its preliminary instructions to the jury the court defined the word "injury" as being "damage or harm to the physical structure of the body or any portion or organ thereof, and such diseases or infections as *naturally* result therefrom."

In view of this explanation we are of the opinion that appellant's objection to the above special issue was properly overruled.

Appellant requested and the court refused to submit to the jury the following special issue:

"Do you find from a preponderance of the evidence that the sole cause of the development of glaucoma in plaintiff's eye in July, 1949, was its diseased and degenerative condition on and immediately prior to November 27, 1948?

The court did submit this issue:

"Do you find from a preponderance of the evidence that the sole cause of the loss of plaintiff's vision in his right eye, if any, was its condition on and immediately prior to November 27, 1948."

Appellant's contention is than an affirmative answer to his requested issue would preclude recovery for partial incapacity as well as recovery for the loss of an eye whereas an affirmative answer to the issue submitted would not preclude recovery for partial incapacity.

It is undisputed here that appellee's right eye was removed because it had developed secondary or acute glaucoma so whatever caused this disease was, in law, a cause of the loss of the eye. If the loss of appellee's eye was caused solely by its condition before the latest injury then, under this record, the sole cause of the development of glaucoma was its condition before the latest injury.

The practical effect of giving appellant's requested issue would have been to submit the same issue twice which is not required.

Appellant's remaining points, except one, relate to the insufficiency of the verdict to support a judgment for recovery for partial incapacity. Since the trial court did not render such a judgment and we are not rendering such a judgment, these points are immaterial.

The last point is that the trial court was without jurisdiction to try this case because it appears that appellee did not file his claim for compensation with the Industrial Accident Board until more than six months after his injury and because he did

not plead nor prove "good cause" for such delay. Sec. 4a, Art. 8307, V.A.C.S.

It is conceded that appellee did not file his claim with the Board within six months from the date of his injury.

Appellant did not deny the existence of "good cause" under oath or otherwise and did not except to appellee's petition specially or otherwise on the ground that "good cause" was either not pleaded or not sufficiently pleaded. The question was first raised by motion for instructed verdict made after appellee rested his case.

"Good cause," under consideration here, need not be *proved* unless denied by verified pleadings. Sec. n, Rule 93, T.R.C.P.

Appellee relies upon the following paragraph of his petition as alleging "good cause."

"Plaintiff would further show that within the time prescribed by law and on or about December 2, 1948, the employer filed his notice of injury with the Industrial Accident Board and that Plaintiff's notice of injury was filed with the Industrial Accident Board on or about August 17, 1949, after the Defendant herein had contacted Plaintiff upon several occasions and discussed with him the possibility of a settlement for such injuries. Plaintiff would show that he had been advised by Raymond Campi, his employer and brother-in-law, that all necessary notices had been filed and that he, Raymond Campi, would see that any and all required notices and claims for compensation required by the Industrial Accident Board would be properly and timely filed."

■ In the absence of a sworn denial or special exceptions it is our opinion that these allegations are sufficient for the purpose of pleading "good cause" for failure of appellee to file his claim within six months from the date of injury.

Furthermore we are of the opinion that it was not necessary for appellee to plead "good cause" for delay in filing his claim with the Board.

Appellee expressly pleaded that " * * * he made claim for compensation before said Industrial Accident Board for compensation * * *." The petition does not allege the date on which this claim was filed.

The pertinent portions of Sec. n, Rule 93, T.R.C.P., read:

"(n) In the trial of any case appealed to the court from the Industrial Accident Board the following, if pleaded, shall be presumed to be true as pleaded and have been done and filed in legal time and manner, unless denied by verified pleadings: * * *.

"(2) Claim for compensation."

■ In our opinion this rule precludes appellant from questioning the jurisdiction of the court in the manner here attempted. As applied to this case the rule, eliminating inapplicable portions, reads:

"In the trial of any case appealed to the court from the Industrial Accident Board the following, if pleaded, shall be presumed to * * * have been done and filed in legal time and manner, unless denied by verified pleadings. * * * Claim for compensation. * * *"

The presumption of this rule is that appellee's claim for compensation was "filed in legal time and manner" and appellant not having denied this fact, so established, by a verified pleading, the presumption becomes conclusive.

Finding no reversible error, we affirm the trial court's judgment.

Affirmed.