WEST TEXAS STATE BANK, Appellant,

v.

TRI–SERVICE DRILLING COMPANY,
Inc., Appellee.

No. 3556.

Court of Civil Appeals of Texas.

Eastland.

Sept. 30, 1960.

Rehearing Denied Oct. 21, 1960.

Crenshaw, Dupree & Milam, Lubbock, Gene I. Dulaney, Snyder, for appellant.

Stubbeman, McRae, Sealy & Laughlin, Lowell E. Branum, Midland, for appellee.

COLLINGS, Justice.

Appeal from the District Court of Scurry County.

The litigation involved in this appeal was commenced in cause number 7477 in the District Court of Scurry County when Tri-Service Drilling Company, Inc., on July 22, 1958, brought suit against the West Texas State Bank to recover $67,000 which it alleged the bank had taken from its account without authority and loaned to Bel-Aire Pipeline Contractors. The bank answered that in April of 1956 it loaned to Tri-Service Drilling Company, Inc., the sum of $80,-000, as evidenced by its promissory note; that at the direction of plaintiff $13,000 of said amount was deposited to its account in the bank and $67,000 was paid and delivered as a loan to Bel-Aire Pipeline Contractors. The bank further alleged that the $80,000 note and another note in the sum of $20,000 were renewed and extended by a $100,000 note dated August 16, 1956, and that the last mentioned note was paid in full by plaintiff in monthly installments of $5,000 each. Based upon these facts, the bank plead voluntary payment, waiver and estoppel. Thereafter on February 9, 1959, the bank in cause number 7597 filed suit against Tri-Service Drilling Company, Inc., to recover on a promissory note dated August 20, 1958, in the principal sum of $62,500. The last mentioned note was by its terms payable in 18 monthly installments of $3,600 plus interest. It was alleged that there was due on said note the sum of $56,152.72, plus interest and attorney's fee, for which the bank sought judgment. Tri-Service Drilling Company answered and filed a cross action, alleging the facts set up in its original petition in cause number 7477 and that the cause of action asserted by the bank on the $62,500 note arose out of the same transactions and occurrences that were the subject matter of the original suit by Tri-Service against the bank. The court consolidated the causes and upon a trial, the jury found that M. W. Branum, President of Tri-Service Drilling Company, Inc., did not agree with Nolan Watson, President of the bank, to loan Bel-Aire Pipeline Contractors the sum of $67,000, and that Tri-Service Drilling Company did not approve the transaction in which it was charged $67,000 for a loan to Bel-Aire. The jury also found

that the proceeds of the $100,000 note was used by the bank to take up the $80,000 note of April 13, 1956, and the $20,000 note of May 6, 1956. It was stipulated that Tri-Service Drilling Company had knowledge in September of 1956 that the $67,000 proceeds from the $80,000 note was advanced to Bel-Aire Pipeline Contractors and that after receiving such notice Tri-Service Drilling Company paid the monthly payments of $5,000 each until the $100,000 note was paid in full.

After overruling the bank's motion for judgment non obstante veredicto, judgment was entered in favor of Tri-Service Drilling Company, Inc., on its claim against the West Texas State Bank for the sum of $67,000 plus interest from April 13, 1956. Judgment was rendered in favor of the bank on its claim for the sum of $55,300. These amounts were offset against each other and judgment was rendered for Tri-Service Drilling Company, Inc., against the West Texas State Bank for the net amount of $23,067.23. The bank has appealed.

The pleadings and evidence viewed in the most favorable light to the verdict and judgment, show the following facts and circumstances: Appellee, Tri-Service Drilling Company, had been doing business with appellant, West Texas State Bank, since about 1950, and in order to facilitate the borrowing of money for payrolls and similar operations, Mr. Branum, president of appellee, had signed blank notes payable to West Texas State Bank which were kept by Mr. Nolan Watson, the president of the bank. As the need arose for money for payrolls for similar operating expenses, Watson would call Branum, advise him of the need for a new note and then upon the authority of Branum complete the note for the proper amount. This practice had been in operation for a period of more than three years prior to the transactions here involved. It was undisputed that Watson did not have the authority to complete a note without first confirming the transaction by telephone or otherwise with Branum.

About the first week in May, 1956, when appellee received its monthly statement, appellee noted a discrepancy of $13,000 in its favor in its bank account. Appellee made repeated requests to the bank but was unable to get information concerning the discrepancy. In August of 1956 appellee executed a note to the bank in the amount of $100,000, secured by a chattel mortgage on "One National T–20 Drilling Rig". Branum stated that at the time appellee owed the bank approximately $33,000, being a $20,000 note and an additional indebtedness of $13,000, and owed the National Supply Company about $27,000. Appellee was also in need of about $40,000 for operating capital and the $100,000 note was executed by appellee for the purpose of supplying these needs. A note in that amount and chattel mortgage were, at appellee's request, mailed by the bank to appellee on August 16, 1956, and were returned executed by appellee on August 17, 1956.

When appellee received its bank statement on September 4, 1956, it found a large overdraft with no deposit entry for the $100,000 note. After a telephone conversation with the President of the bank, such bank official brought a deposit slip to appellee's office in Midland dated "4/1956" indicating the execution of a note by appellee in the sum of $80,000. Branum thus learned that the $100,000 note secured by chattel mortgage had been used by the bank to take up the $20,000 note which he owed the bank, and the $80,000 note completed by Watson without his authority. The deposit slip indicated that $13,000 of the total amount of $80,000 was placed on deposit to appellee's credit and that the amount of $67,000 had been loaned to "Bel-Aire P. L. Co." A deposit slip received by appellee in September, 1956, also showed that appellee's account had been charged with amounts totaling $2,223.33 for interest on the $20,000 and $80,000 notes. This was the first knowledge that appellee had of the fact that the President of the bank had completed the note in April of 1956 in the sum of $80,000, using one of the blank notes which Branum had

signed and left with the bank. Branum had not authorized the completion of such note. It was also the first knowledge that appellee had of the Bel-Aire Pipeline Company's transaction of $67,000 or of the details of how the $13,000 item had been placed to its credit in the bank. On this occasion, Watson, the president of the bank, tendered to Mr. Branum for appellee a promissory note dated April 12, 1956, in the sum of $71,500 executed by Bel-Aire Pipeline Contractors and payable to Tri-Service Drilling Company. This was the first knowledge that Branum had of that note and he refused to accept it and claimed there had been a willful and wrongful misapplication of appellee's funds in the sum of $67,000. Branum testified that he never agreed at any time to make any such loan to Bel-Aire Pipeline Contractors; that prior to the time he was shown the above deposit slip, he had never heard of Bel-Aire Pipeline Contractors or had any business connection with them whatever. He testified however, that Watson wanted him to keep the Bel-Aire note; that he did not want to take it back and said: "Just leave it in your file." Branum testified that he did keep the note but did not accept it as an obligation of Bel-Aire; that he told Watson "We will not accept it. * * * I cannot loan this company's funds * * *." Branum told Watson that appellee had already issued checks which would cause its account to be overdrawn and that they just could not accept the note. Watson promised Branum that he would get some money back somehow; that he would put it back; that the Bel-Aire deal would be cleared up in two or three weeks and promised that he would put the money back in appellee's account. This, however, was not done. It was under these circumstances that appellee executed a note to the bank on September 13, 1956, in the sum of $60,000 to cover the overdrafts caused by the lack of a deposit out of the $100,000 transaction. This $60,000 note, by addition of interest upon several subsequent extensions and renewals, became the $62,500 note sued upon by appellant in cause number 7597. It is undisputed that this note was not paid by ap-

pellee except for credits reducing the amount of $56,152.72 as hereinafter noted. In this connection Branum testified: "The bank owed me $67,000.00, and I owed the bank $62,500.00. If you want to put it that the bank owes me $67,000.00 then I will say that I owe the bank $62,500.00. Actually we are talking about $20,000.00 difference there." As heretofore noted, it was stipulated that after appellee acquired knowledge in September of 1956 of the $80,000 note and that the $67,000 proceeds from the note had been loaned to Bel-Aire Pipeline Contractors, appellee made monthly payments of $5,000 each on the $100,000 note until it was fully paid. Branum testified that these payments were made by appellee in compliance with the desire of the bank that appellee should let the $67,000 transaction "ride along". He stated that he discussed the matter with the directors of the bank and testified as follows:

"Q. Give the conversation as best you can, and then the Court and the jury will decide whether you * * * A. * * * We discussed the merits of the possibilities that Bel-Aire might * * * and Nolan might bail himself out with that Bel-Aire deal. We talked, said that we would ride along on that thing for a little time to see what happened. At that time Bel-Aire had a lawsuit against the City of Colorado Springs; and, we were going to kind-of sit in the saddle and see what developed, with the full understanding that we had notified the bank. We had made demand and the bank knew that we wanted our $67,000.00 regardless of whether anything came back from Bel-Aire Pipeline Contractors or not, because we didn't recognize the debt as Bel-Aire debt. We recognized the debt as the debt of the West Texas State Bank.

"Q. Was there anything discussed concerning you going ahead and paying these payments on the $100,000.00 note? A. Well, * * * we * * *

along with the $100,000.00 note, we had the $60,000.00 note there. Actually, we * * *

"Q. So you had the two notes: the $100,000.00 note, and the $60,000.00 note. Was there anything discussed concerning your going ahead and paying those notes? A. Well, I don't recall whether we discussed going ahead and paying the notes, or not; but, the monthly installment thing was set up. They had a chattel mortgage on the rig. We had this other $60,000.00 thing that we said that we would just let that ride, that it would * * * when it became due, it would be renewed. And, I believe that's just about what—actually, we told them what we wanted, that we wanted our $67,000.-00."

After these discussions, appellee made payments of $5,000 each month on the $100,000 note until the full amount was paid. After the $100,000 note had been fully paid and neither appellant nor its bonding company had paid the $67,000 to appellee, Mr. Branum on April 9, 1958, wrote a letter to the bank demanding payment. The bank made no reply to this letter and on May 21, 1958, Mr. Branum wrote another letter to the bank again demanding payment of the $67,000. Thereafter, on May 26, 1958, Mr. Cargile, the executive vice-president of the bank, wrote to appellee, stating that the demand for payment had been forwarded to the bonding company, and that the bonding company was requesting additional information. On July 22, 1958, appellee, Tri-Service Drilling Company, brought suit to recover the $67,000.

On August 20, 1958, appellee executed the $62,500 note upon which appellant seeks to recover. As heretofore stated, the latter note was a renewal and extension of the indebtedness, including some interest, which originated in the $60,000 note executed by appellee on September 13, 1956. This indebtedness had been renewed and extended several times and no payments had been

made upon the principal. In September and October appellee made two installment payments of $3,600 each plus interest. When appellee failed to make further payments on this note, appellant on February 9, 1959, brought suit to recover thereon.

In numerous points appellant contends that the undisputed evidence shows as a matter of law that appellee, Tri-Service Drilling Company, Inc., is seeking to recover a voluntary payment; that it had ratified the transaction and is now estopped and not entitled to recover any amount from appellant upon its claim for $67,000; and that the court erred in overruling appellant's motions for instructed verdict and for judgment notwithstanding the verdict; that the verdict is not supported by any evidence and is against the great weight and preponderance of the evidence.

We cannot agree with appellant's contention in this respect and said points are overruled. As urged by appellant, "It is a well settled general rule that a person cannot either by way of set off or counter claim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment exists." 70 C.J.S. Payment § 133, pp. 341, 342, 343; Taylor v. Hall, 71 Tex. 213, 9 S.W. 141; 32 Tex.Jur. 727, 728. The rule applies even though the payor protests at the time against his liability. Edwards v. Williams, Tex.Civ.App., 93 S.W.2d 452. However, what constitutes a voluntary payment depends upon whether the facts in a particular case indicate an intention on the part of the payor to waive his rights. 70 C.J.S. Payment § 134, p. 344. As an illustration it is held that a payment made with a reservation of the right to bring suit for its recovery is not a voluntary payment. Lobit v. Marcoulides, Tex.Civ.App., 225 S.W. 757 (Writ Ref.). It is also held that a payment made under business necessity may be recovered as made under compulsion. Exporters & Traders Compress &

Warehouse Co. v. Spivey, Tex.Civ.App., 249 S.W. 1086.

In the instant case the evidence supports the conclusion that appellee was at all times contending that appellant bank was indebted to it in the sum of $67,000 and did not intend at any time to waive such indebtedness. Appellee and appellant had been doing business together for several years and the evidence clearly indicates an attitude of mutual confidence and trust between the parties. The bank, through its president Watson, in the manner heretofore set out, misapplied $67,000 of appellee's funds by applying it without authority to a loan to Bel-Aire Pipeline Contractors. When the facts came to the knowledge of appellee and the directors and other officers of the bank in September of 1956, appellee's president Branum testified that he discussed the matter with the bank officers and it was their desire that the matter should "ride along" to see what would happen. It was contemplated that Watson, the president of the bank, "might bail himself out with the Bel-Aire deal"; that this was with the full understanding that appellee had made its demand on the bank for the $67,000 and wanted its money regardless of whether anything came from Bel-Aire or not. Branum testified, in effect, that the $5,000 monthly installment payments on the $100,000 note until it was fully paid were made by appellee in compliance with the bank's desire to let the matter "ride along". It is also to be noted that the bank had a chattel mortgage on appellee's "rig", securing the $100,000 note, and had made the loan in the sum of $60,000 with the understanding that it was to be renewed and carried by the bank pending settlement of the matter. The $60,000 note was extended and renewed several times and by addition of interest became the $62,500 note executed by appellee on August 20, 1958. This note provided for monthly payments in the sum of $3,600 until paid. Prior to the execution of this note and prior to the two payments made thereon, appellee was demanding payment from the bank of the $67,000. In a letter replying to these demands the bank advised appellee that its demand had been referred to the insurance company and that the insurance company had requested additional information which the bank had furnished and that appellee would be notified as soon as any further word was received. We cannot agree with appellant's contention that this did not imply that the bank thought the insurance company would pay appellee the $67,000. Branum testified that he relied upon the letter of the bank and his discussion with the directors as a basis for making the two payments on the $62,500 note. In our opinion the evidence supports the finding of the jury that appellee Tri-Service Drilling Company never approved the transaction in which it was charged $67,000 for a loan to Bel-Aire and supports the conclusion that appellee never at any time by any payments made intended to waive its claim against the bank for such amount.

As heretofore indicated, appellee introduced evidence showing that in April and May of 1958 it had made demand upon the bank for payment of the sum of $67,000. These demands were shown by letters from appellee to the bank dated April 9, 1958, and May 21, 1958. Appellee then introduced a letter, designated as plaintiff's exhibit number 19, which Branum testified he had received from the bank in reply to his letters of April 9th and May 21st. The letter was as follows:

"West Texas State Bank
Snyder, Texas
May 26, 1958

"Mr. M. W. Branum
Box 1785
Midland, Texas

"Dear Mr. Branum:

"I am in receipt of your letter of May 21, 1958, making inquiry as to what had been done in connection with your demand on our bank for return of the amount of $67,-

000.00 (sixty-seven thousand dollars) to your account.

"Your request was forwarded to the insurance company and they wrote us back requesting some additional information which we furnished them. Since that time we have not had any communication with them. Mr. Boren is writing the company again and we will let you hear just as soon as we hear from them.

"Yours very truly,

/s/ H. W. Cargile
H. W. Cargile
Executive Vice President

"HWC:rj"

In points 7 and 8 appellant contends the court erred in overruling its objection to the introduction of the letter on the ground that it was immaterial to any issue in controversy, that it injected liability insurance in the case and was prejudicial to the rights of appellant; that the court erred in overruling appellant's motion for a mistrial after the letter was read to the jury. Appellant's points 7 and 8 are overruled. When insurance is relevant on some issue in the case it is not only proper for a court to admit it in evidence but it would be error for the court to refuse to do so. Aguilera v. Reynolds Well Service, Inc., Tex.Civ. App., 234 S.W.2d 282 (Writ Ref.). In the instant case the reference to insurance was admissible to explain why appellee did not take immediate action to recover its $67,000 and to explain and clarify appellee's action in executing the $62,500 note on August 20, 1958, and the payments made on that note. The contents of the letter bearing upon insurance were relevant to the questions of approval, waiver and estoppel. The letter tended to explain and excuse the delay of appellee in pressing its claim, and in making payments on the $62,500 note because the bank was apparently suggesting that the bonding company would take care of its claim, but that additional time was required for the bonding company to make investigation. It tended to explain the delay of appellant in pressing its claim in a manner that was consistent with appellee's contention that the claim against the bank had not been waived.

Appellant's 9th and 10th points also urge that the court erred in permitting the question of insurance to be injected into the case. The 9th point complains of the action of the court in refusing appellant's motion for a mistrial after the witness Branum stated that one of the members of the bank's board of directors said to him: "Buddy, we did not hire Mr. Milam." Appellant's contention is that the effect of this statement was to advise the jury that the attorney Mr. Milam was employed by an insurance or bonding company. Even so, it tends to explain and excuse appellee's action in thereafter making two payments on the $62,500 note. Under the circumstances Branum was justified in concluding that the attitude of the bank had not changed and that the bank was not "after his hide" as it had seemed to Branum when the attorney took his deposition. The bank reassured Branum by stating to him that it had not hired the attorney. At the same time appellant requested the court to instruct counsel for appellee and the witness Branum not to refer to insurance, bonding company or surety because such matters were irrelevant and immaterial to any issue in the case and prejudicial to appellant. Appellant's 10th point complains of the action of the court in overruling such request. These points are overruled. What was said in reference to points 7 and 8 is applicable to points 9 and 10. The evidence was relevant and material in that it tended to explain why appellee made two payments on the $62,500 note in a manner consistent with its contention that the $67,000 claim against the bank had not been waived.

Special issue number 1 inquired whether Branum, president of appellee, agreed with Watson, president of appellant bank, to loan Bel-Aire Pipeline Contractors

the sum of $67,000 from the money or bank account of appellee. The jury answered that "He did not agree." Special issue number 2 inquired if appellee approved the transaction in which its account was charged $67,000 for the loan to Bel-Aire Pipeline Contractors, and the jury answered: "It did not approve the transaction." Appellant objected to the submission of special issue number 1 because the court did not instruct the jury that an agreement could be either express or implied, and in connection therewith appellant submitted a requested definition of the term "agreement". Appellant objected to the submission of special issue number 2 because the court did not instruct the jury that an approval could be either express or implied, and in connection therewith submitted a requested definition of the term "approval". The requested definitions were refused and appellant's objections to the submission of the special issues were overruled. The court also refused appellant's request for an instruction on circumstantial evidence. In numerous points appellant complains of the action of the court in overruling its objections to the court's charge and in refusing to submit the requested explanatory instructions. These points are overruled. The terms "agree" and "approve" are words of common usage. As used in the issues submitted to the jury they had only the usual and customary meaning. It is not necessary to define such terms. National Auto & Casualty Ins. Co. v. Layman, Tex.Civ.App., 248 S.W.2d 993 (Ref. N.R.E.) ; Kendall v. Johnson, Tex.Civ.App., 212 S.W.2d 232. There was no reversible error in refusing the requested instruction on circumstantial evidence

■ Appellant complains in its 19th point that the court erred in failing to award judgment for attorney's fees upon its $62,500 note. The note provided for payment of ten percent attorney's fees if placed in the hands of an attorney for collection and it is undisputed that the note was placed in the hands of an attorney for collection. It is likewise undisputed that appellee is liable upon the note except for the fact that the bank is indebted to appellee in an even greater amount. Appellee is not liable for attorney's fees because he has proved a valid defense to the plaintiff's suit against him on the note. He was never in default on the note because appellant was at all times involved, indebted to appellee for the $67,000 which was in excess of the amount of the $62,500 note and interest thereon. The offsetting claim arose out of the same transaction. In the case of Laning v. Iron City National Bank, 89 Tex. 601, 35 S.W. 1048, 1050, the Supreme Court of Texas held as follows:

"In this case the amount of the damages found by the jury for defendant was greater than the whole amount of the principal and interest of all the notes, and as, the defendant had the legal right to offset such damages against the plaintiff's claim upon the notes against him, there was, in fact, at the time the notes fell due, nothing justly and rightfully due from the defendant to the plaintiff; for, although the unliquidated damages would not operate as an extinguishment of the notes, the claim could by law be so applied by the court."

In this connection also see Wagner & Chisholm v. Dunham, Tex.Civ.App., 246 S.W. 1044; Broun v. Collier, Tex.Civ.App., 35 S.W.2d 1050 (Writ Dis.) ; Ware v. Paxton et ux., Tex.Civ.App., 266 S.W.2d 218, 227 (Ref.N.R.E.) ; 11 C.J.S. Bills and Notes § 726, p. 275.

The judgment is affirmed.