**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 00-30773
_____

T L JAMES & COMPANY, INC.,

                                                  Plaintiff,

versus

TRAYLOR BROS INC; ET AL.,

                                                  Defendants,

TRAYLOR BROTHERS, INC.,

                                                  Defendant- Third Party
                                                  Plaintiff-Appellant,

versus

BOARD OF COMMISSIONERS OF THE PORT OF
NEW ORLEANS,

                                                  Defendant- Third Party,
                                                  Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

July 2, 2002

Before EMILIO M. GARZA, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Plaintiff-Appellant, Traylor Brothers, Inc. ("Traylor"), appeals from the district court's final judgment and order denying Traylor additional compensation for alleged extra work performed pursuant to a construction contract between Traylor and Defendant-Appellee, the Board of

Commissioners of the Port of New Orleans ("Port"). For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL BACKGROUND

On April 6, 1994, the Port announced the Nashville Avenue Terminal Complex Wharf and Shed C project ("Project") and solicited bids nationwide. The work involved (1) driving piles both in the Mississippi River and on land, (2) laying a concrete deck on top of the piles, and (3) building a large terminal shed on top of the deck with railroad tracks and a large truck loading area. Drainage and ancillary services for plumbing, electricity, portable water, and fire protection were also required. The Port provided a set of contract documents ("Bid Package") for all perspective bidders, which included the plans and specifications for the Project. The documents also advised the bidders that there were "unknown infrastructures" at the site and that there were "numerous steel and timber piles removed to the approximate existing mudline in the area of the required dredging."[1] The Port agreed to compensate the contractor up to $100,000 for "removal, relocation, or for reconstruction of [unknown] infrastructures encountered during the construction phase which were not indicated or shown, or differs substantially from the contract document." The Port defined "unknown infrastructures" as "any man-made objects encountered during the required work *excluding objects and materials indicated on the Contract Drawings and/or reasonably known by the Contractor through a pre-bid inspection of the site* which conflict with new construction." (emphasis added). For a more detailed map of the area, the bidders were referred to the Port's maps and archives room. The documents also provided that any costs incurred due to cutting off piles were to be the responsibility of the bidder. After visiting the construction site, Traylor submitted the lowest bid and

---

[1]These obstructions were created by the demolition of a structure that was on the site prior to the construction of the wharf.

was awarded the contract.[2] Construction was to begin on July 11, 1994, and was to be completed on January 31, 1996. If the Project was not completed timely, the contract provided for liquidated damages in the amount of $2,000 for each day of delay.

Traylor subcontracted with T.L. James & Company ("TL") to do the dredging work for the Project. Shortly after construction commenced, Traylor began to encounter a significant amount of obstructions which Traylor maintains were not evidenced in the plans and specifications for the job. It contends that these obstructions discovered during the dredging work performed by TL, and during Traylor's pile driving work, caused a "ripple effect" and set off delays, which impacted the entire Project. Traylor further alleges that prior to inviting bids, the Port had information regarding these latent obstructions including blue prints, drawings, and overlays, which it failed to produce prior to accepting Traylor's bid. The largest problem encountered was the existence of a concrete slab in the middle of the dredge site. The Port was informed of the slab on December 22, 1994 and on March 31, 1995, it was removed by an outside subcontractor. Because of the delay in removing the obstruction, TL demobilized and left the site on March 14, 1995. However, TL later returned to the site and completed the dredging on September 18, 1995. The Project was eventually finished in March of 1997, over a year after the expected completion date.

TL brought suit against Traylor and its surety Aetna Casualty and Surety Company ("Aetna"), Traylor's insurer, in state court seeking additional costs incurred due to the delay in dredging. As a result, Traylor and Aetna filed a third party demand against the Port for any amounts Traylor might owe to TL and for additional compensation due Traylor for delay in construction. Traylor then

---

[2]The Port's estimate for the job was $30,000,000-35,000,000 and Traylor submitted a bid of $ 25,424,440.

removed the case to federal court. Before trial, TL settled and dismissed its claim against all parties. After TL filed its stipulation of dismissal, Aetna dismissed its third party demand against the Port and the Port filed a counter-claim against Traylor for liquidated damages. The claims were heard by the district court without a jury.

At trial, Traylor argued that the Port knew that there were significant obstructions in the site area, but failed to advise Traylor of the obstructions in its plans and specifications. Traylor contended that it had no obligation to investigate or otherwise rely on information not set out in the plans and specifications provided by the Port concerning possible obstructions. Representatives of the Port testified that if any obstructions are shown in the plans, or otherwise identified in the contract, the obstructions cannot be considered "unknown infrastructures", thus, the cost for removal and disposal would not be borne by the Port. They further interpreted the contract to mean that even if an obstruction is not evidenced in the Bid Package, the obstruction is still not an "unknown infrastructure" if it could have reasonably been discovered by searching the Port's maps and achives room.

The district court awarded Traylor $287,032.50 plus interest and costs, finding that the Port wrongfully assessed Traylor with barge demurrage charges. However, the district court dismissed Traylor's claim for additional compensation and the Port's claim for liquidated damages. Thereafter, Traylor filed a motion for new trial, which was denied. However, the district court amended Traylor's award to include pre-judgment interest under Louisiana law. Traylor now appeals.[3]

STANDARD OF REVIEW

---

[3]The Port does not appeal the award of barge demurrage charges to Traylor or the district court's denial of its liquidated damages claim.

A district court's interpretation of a contract is reviewed *de novo*. Musser Davis Land Co. v. Union Pacific Resources, 201 F.3d 561, 563 (5th Cir. 2000). Thus, this court must "review the record independently and under the same standard that guided the district court." Am. Totalisator Co., Inc. v. Fair Grounds Corp., 3 F.3d 810, 813 (5th Cir. 1993) (citing Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir. 1988)). A *de novo* standard of review is also applied to a court's conclusions of law. Reich v. Lancaster, 55 F.3d 1034, 1045 (5th Cir. 1995). We will not set aside a district court's factual findings, unless they are clearly erroneous. United States v. Hill, 258 F.3d 355, 357 (5th Cir. 2001).

## DISCUSSION

### I.      Unjust Enrichment

Under an unjust enrichment theory, Traylor argues that it is entitled to compensation for extra work performed, which was necessary for the completion of the Project. The contract defines "extra work" as work neither shown on the drawings nor reasonably implied elsewhere in the contract and for which no price had been named in the agreement. To establish a claim for unjust enrichment, the plaintiff must prove: (1) the defendant was enriched, (2) the plaintiff was impoverished, (3) a connection between the enrichment and resulting impoverishment, (4) no justification exists for the enrichment and the impoverishment, and (5) there is no other remedy at law. Schiro-Del Bianco Enter., Inc. v. NSL, Inc., 765 So. 2d 1087, 1092 n.3 (La. Ct. App. 2000) (citing Minyard v. Curtis Products, Inc., 205 So. 2d 422 (La. 1967)).

Traylor asserts that (1) the Port was unjustly enriched because it received a completed wharf structure; (2) Traylor was impoverished because the Port refused to compensate it for additional costs incurred due to cutting of concrete piles; and (3) there was no justification for the enrichment because

5

the Port had knowledge of certain obstructions, the Port selected the piles and the length, and the Port set the pile driving criteria.

The Port maintains that Traylor has not met its burden under this theory for several reasons. First, it argues that it has not been "enriched," as it only received what it paid for under the contract: a completed wharf structure. In addition, the Port contends that even assuming *arguendo* that there was an "enrichment," a claim for unjust enrichment was nullified by the contract. We agree. Traylor has not met the first and second elements of an unjust enrichment claim. The Port was not enriched - it received what it bargained for under the contract, a wharf structure, and nothing more. In addition, since the contract provided a remedy for any additional costs incurred by Traylor, it has failed to meet the fifth element, i.e., no remedy at law. Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 538 So. 2d 569, 575 (La. 1989) (*action de in rem verso*, a counterpart to unjust enrichment, is not available where there is an independent remedy at law, i.e, a contract exists). Accordingly, we find that Traylor is not entitled to additional compensation under this theory.

II.     Adequate plans and specifications

Next, Traylor argues that the plans and specifications provided by the Port, prior to the submission of its bid, were insufficient in that they failed to give an accurate account of the conditions of the Project site. Because of the alleged inadequate contract documents, Traylor asserts that it suffered substantial unforseen costs, which should be borne by the Port. The district court treated Traylor's claim as one for equitable adjustment due to changed conditions and delays. Louisiana law has not yet established the elements necessary for the above cause of action. However, in analyzing the claim, the district court adopted the elements set out by the Federal Circuit Court in Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987). Under Stuyvesant Dredging

6

Co., in order to recover for equitable adjustment, the "conditions actually encountered in the field must have been reasonably unforeseeable based on *all of the information available at the time of the bid*." Id. (emphasis added). In addition, the contractor has to establish that "it reasonably relied on the contract and related materials and that it suffered damages as the result of the material difference between the expected and encountered conditions." Id.

A.     Duty to Investigate

The district court determined that the contract adequately advised Traylor of possible "unknown infrastructures" on the site and referred Traylor to the maps and archives room for detailed maps of the area. It also found that Traylor had a duty to investigate the site and to review information concerning a prior structure on the Project site, which was available at the Port's office, to ensure that the site conditions stated in the plans and specifications were accurate. Finding that Traylor failed to conduct an adequate investigation, the district court concluded that it was not entitled to damages.

The relevant provision contained in the Bid Package provides as follows:

*The Contractor is obligated to visit the site and study existing conditions. The Board assumes no responsibility for the discrepancies or differences between existing conditions and conditions indicated on drawings or combination of original construction plans (available for review at the Board's office) and recent surveys conducted by the Board.* Every reasonable effort has been made by the Board to indicate and describe existing conditions at the project site with an acceptable degree of accuracy, but the Contractor is held responsible for performing his work under existing conditions as he finds them at the time of performing work, and payment of extra work will not be allowed because of reasonable discrepancies or differences, which are encountered at the time work is performed. (emphasis added).

The contract also advised that there were "numerous steel and timber piles removed to the approximate existing mud line in the area of the required dredging" and that the demolition of an existing structure on the Project site would be accomplished prior to the expected commence date

7

of the Project.

Traylor argues that the Bid Package itself did not sufficiently notify Traylor of the kind, number, and size of the obstructions that it may encounter. It asserts that everything necessary for a bid must be provided in the Bid Package and that it had every right to expect that the site would be free from obstructions other than those evidenced in the plans and specifications distributed by the Port. If the plans and specifications fail to completely and accurately present the scope of the Project and the problems that may be encountered, Traylor claims that any additional costs incurred must be borne by the Port. Traylor challenges the district court's consideration of any knowledge that Traylor may have obtained regarding the obstructions had it conducted a thorough investigation of the Project site as a basis for denying it additional compensation. Traylor maintains that its right to recover additional compensation does not depend on what it knew or should have known about the Project site before submitting their bids. It explains that the contract is governed by industry practices and public law, which provide that the risk of differing site conditions are placed on the owner for circumstances beyond the contractor's control. Thus, Traylor concludes that its knowledge at the time of bidding is irrelevant.

In support of its position, Traylor relies on Con-Plex, Division of U.S. Industries., Inc. v. Louisiana. Department. of Transportation & Development, 439 So. 2d 567 (La. Ct. App. 1983). In Con-Plex, the Department of Transportation ("DOT") advertised for bids to construct a bridge and to remove an existing pontoon bridge. Con-Plex obtained a set of plans and specifications and conducted a contractually required on-site inspection. Relying upon the aforementioned plans and specifications and a site inspection, Con-Plex submitted a bid and was awarded the job. Upon commencing removal of an existing bridge on the site, it became apparent that the plans and

8

specifications relating to the Project did not accurately reflect the number or size of pilings to be removed. The court held that the DOT failed to provide adequate plans and specifications and to warn prospective bidders of the true number and location of pilings to be removed. Accordingly, the court held that Con-Plex was entitled to additional compensation. Traylor avers that since there is no meaningful distinction between Con-Plex and the present case, it is entitled to an award of damages.

Traylor's reliance on Con-Plex is misplaced. In Con-Plex, the DOT did not allege that Con-Plex failed to adequately investigate the site prior to submitting its bid. Instead, it contended that the language of the contract entered into by the two parties put Con-Plex on notice that the plans and specifications did not indicate all the piles then in existence, and that the site inspection required by the contract cured any failure or deficiency in the plans and specifications. The trial court determined that DOT violated the public bid law when it prepared a contract which "passed on" or imposed a duty to inquire upon the bidders. Expressly rejecting this theory, the state appellate court affirmed the trial court's judgment, but only on contractual grounds. Specifically, the court determined that the terms of the contract did not adequately warn Con-Plex of the site conditions, and that the language of the contract was ambiguous. Here, as in Con-Plex, Traylor had a contractual duty, prior to submitting its bid, to adequately examine the site to determine whether it was possible to perform the job. One notable difference between Con-Plex and the present case is that Con-Plex was hired to both remove an existing structure and to build a structure at the same location, a bridge, whereas here, Traylor was only hired to build a structure, the wharf. The divergence that is fatal to Traylor's claim, however, is that the contract in this case, unlike in Con-Plex, sufficiently warned Traylor of the obstructions that may be encountered. Specifically, the contract advised that there were

9

"numerous steel and timber piles removed to the approximate existing mudline in the area of the required dredging" and that there were unknown infrastructures for which the contractor would be compensated up to $100,000 for the "removal, relocation, or for reconstruction of [unknown] infrastructures encountered during the construction phase." The only obstruction that Traylor could logically argue constituted an unknown infrastructure was the concrete slab in the dredging area. This obstruction, however, was removed at the Port's expense.[4] Traylor does not dispute that it was advised of the obstructions for which it now complains. Instead, it maintains that the number of the obstructions encountered were far greater than anticipated. During trial, Michael Traylor ("Michael"), a civil engineer, who was the lead estimator of the Project bid team for Traylor, testified as follows:

COURT: When the Port tells a prospective bidder . . . contractors shall be advised that there are numerous steel and timber piles removed to the approximate existing mudline in the area of the required dredging, what does that mean to you?

MICHAEL: It means that there are some old piling out there. Numerous is a very questionable number. I would have guessed about fifteen, twenty wood piles that were removed for some reason, to the mudline.

COURT: What do you base that guess on?

MICHAEL: There is no way to guess, really, I would just assume that, you know, to be competitive in bidding a job. I looked at it and I said to my self, these piles, you don't know exactly how many there are. But I talked to [TL] and they said that they have done lots of bridge dredging and they would give us a competitive price. And they were fine with this specifications and it was a riverside excavation specification.

COURT: And if your guess is wrong, as it was here, who do you think is

[4]The district court found that at the time the concrete slab was removed, Traylor was driving piles approximately 350 feet away from where the slab was located. Thus, it determined that the slab was removed long before it could have caused any delay or disruption in Traylor's work.

10

responsible for the error?

MICHAEL: My guess, I'm saying what my guess is, at this point of time, of twenty, I personally believe that if they put a very vague thing like numerous in here, especially since it is in the river excavation, the things are going to be removed. . . .

COURT: You didn't see any need or any of your engineers or even [TL] saw no need to find out more information about how many or to what extent that phrase meant, numerous steel and timber piles?

MICHAEL: We did not.

If the district court finds that the contract is clear and unambiguous, the specific provisions within the contract "should not be disregarded under pretext of pursuing its spirit." Cashio v. Shoriak, 481 So. 2d 1013, 1015 (La. 1986). Rather, once the court concludes that the contract is unambiguous, the terms of the contract must be enforced as written. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 764 (La. 1994).

In the present case, the district court never made an expressed determination of whether the term "numerous" as used in the bidding package is vague or ambiguous. Although the court did not explicitly so hold, it is reasonable to conclude that the court found that the term was neither vague nor ambiguous since it concluded that the contract sufficiently put Traylor on notice of the obstructions. While Michael testified that the term "numerous" within the meaning of the contract is vague, Traylor has neither briefed nor argued this issue on appeal. It is well-settled that when a party fails to brief an issue, it cannot be considered on appeal. Matter of Tex. Mortgage. Services Corporation, 761 F.2d 1068, 1074 (5th Cir. 1985) ("[I]ssues not raised or argued in the brief of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals."). Because Traylor is precluded from asserting that the terms of the contract were vague and ambiguous, it has no basis for arguing that the Bid Package failed to provide sufficient notice of

11

the obstructions.

We further reject Traylor's contention that it had no duty to investigate the Project site. The Bid Package specifically provided that

> It is understood that Contractor has, prior to submission of bid, satisfied himself as to the . . . character, quantity, and quality of the materials to be encountered. . . Prior to submitting a proposal, bidders are expected to examine these contract documents in their entirety and *to visit the site of the work, and to investigate operations of the Board and others at the site.* (emphasis added).

Michael Landrieu Mayeux, a civil engineer for TL, testified that his investigation of the Project site consisted of "basically just [standing] on the river bank and look[ing] at the water go by." Further, Michael and Tom Peterman, Traylor's manager of the Project, who was also a member of the bid team, both testified that while observing the Project site, prior to submitting Traylor's bid, they did not examine the maps in the Port's maps and archives room, as suggested by the Bid Package. They simply looked to see if there were any other activities on the sight and whether the water was rising. Michael also admitted that he was aware that demolition work on the site would take place before the Project's commencement date, however, he did not inquire as to how much debris, if any, would be left on the site once the structure was removed.[5]

---

[5]During Michael's testimony the following exchange between Michael and the district court judge took place:

COURT:      [Did] you know at the time you made this pre-award visit that there was a prior demolition and a prior structure?

WITNESS:    I knew that there was an existing structure just by the plans, but there was a demolition contract and I guess I believed that the total structure was removed. When I visited the site, you could not see any thing at all.

COURT:      You know who was awarded the demolition contract?

All of the evidence stated above weighs strongly against an award of damages in favor of Traylor. The contract informed Traylor of both known and unknown obstructions on the site and referred Traylor to the Port's maps and archives room to receive a more detailed map of the premise, which Traylor failed to do. Apparently conceding notice of the obstructions, Traylor attempts to argue that its knowledge of the obstructions prior to bidding is irrelevant because the contract is governed by industry practices and public law, which shifts the risk of differing site conditions to the owner for circumstances beyond the contractor's control.

In support of this proposition, Traylor again points to Con-Plex. Its reliance on Con-Plex is erroneous because the Con-Plex court specifically refused to rule that an owner violates public law when it drafts a contract that passes on, or imposes a duty to inquire upon the bidders. The court only found in favor of Con-Plex because it determined that the terms of the contract did not adequately warn Con-Plex of the site conditions and that the language of the contract was ambiguous. Here, the Bid Package gave Traylor sufficient notice of the obstructions it may encounter and referred Traylor to the Port's maps and archives room for more detailed information. In addition, the Bid Package informed Traylor of the demolition contract. Nevertheless, Traylor did not investigate the "operations of others at the site," as advised by the contract. Lastly, the district court did not rule that the terms of the contract were ambiguous and Traylor does not assert this argument on appeal. Thus, Con-Plex does not support Traylor's contention.

Because Traylor failed to conduct an adequate investigation of the site, it cannot now

---

WITNESS:     No, I didn't.

COURT:     Did you make an effort to find out?

WITNESS:     No.

complain of the character and amount of work it had to perform under the contract. See O'Leary v. Bd. of Port Com'rs for Port of New Orleans, 91 So. 139 (La. 1922) ("Where in an offer for bidders to a contract . . . the bidders were warned to examine the location of the proposed work and acquaint themselves with existing conditions, plaintiff, having accepted, cannot complain of the character and amount of work to be performed under the contract."). Because the obstructions actually encountered by Traylor were reasonably foreseeable "based on all of the information available at the time of the bid," it has failed to meet the first element required to sustain an equitable adjustment cause of action. As the district court correctly stated, the evidence clearly reveals that Traylor suffered from deliberate ignorance, and therefore, is not entitled to additional compensation.

B.     Improper Sequence

The district court also determined that Traylor failed to follow the design sequence as set forth in the Bid Package. The sequence required that the wharf be constructed in the following order: (1) dredging, (2) pile driving, and (3) rip-rap. However, after dredging, Traylor placed the rip-rap, rather than driving the piles. The district court concluded that had Traylor followed the specifications, there would have been no problems with the dredging and the design grade would have been maintained. Accordingly, the district court held that this was another basis for denying Traylor additional compensation.

Traylor concedes that it did not perform the work in the sequence set out by the contract; however, it asserts that the obstructions disrupted the orderly sequence of the Project to such an extent that the proper sequence could not be followed. Traylor reasons that because the job could not have been accomplished except at a greater expense to Traylor, the plans were defective. The law is clear that, as a general rule, "[w]here one agrees to do, for a fixed sum, a thing possible to be

14

performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered." La. Shipbuilding Co. v. Bing Dampskibsaktieselskab, 104 So. 364, 365-66 (La. 1925); See Day v. United States, 245 U. S. 159, 161 (1917). However, when the contractor is required to build according to set plans and specifications prepared by the owner, the "contractor will not be responsible for the consequences of defects in the plans and specifications." Id. (citation omitted). An owner cannot shift this responsibility to the contractor by simply placing the "usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." La. Shipbuilding Co., 104 So. at 365-66 (citing Christie v. United States, 237 U. S. 234, 239-42 (1915)).

In the instant case, Traylor does not allege that the wharf design itself was defective, rather it contends that the number and magnitude of the obstructions encountered caused greater difficulty then Traylor originally anticipated.[6] Having already concluded that the contract documents provided Traylor with sufficient notice of the obstructions, we reject this argument. Because Traylor agreed to perform a task that was possible to complete, it is not entitled to additional compensation simply because it failed to anticipate additional costs when submitting its bid.

---

[6]Traylor does, however, allege that the pile cap design was defective. After all the piles are driven in columns extending out from the sheet pile wall into the river, they must be connected together and tied into the sheet pile wall. This connecting and tying-in is done with a concrete pile cap. The pile caps were designed to be poured-in-place concrete caps. After all the piles were driven and brought into tolerance, a framework or cage of steel reinforcing bars approximately 4-1/2 feet high and 3 feet wide was fitted and arranged over the tops of the piles. Concrete was then poured inside the steel forms over the framework, and the concrete pile caps were constructed.

Traylor asserts that the mis-match of the design requirements for the piling and the caps resulted in the need to rearrange the reinforcing bars resulting in delay and considerable additional work. Because Traylor has failed to establish that the delay was unreasonable, and it has not identified any specific additional costs incurred as a result of retying the reinforcing bars, the district court properly denied additional compensation.

15

Traylor also points out that the contract provided that "if construction is in accordance with the plans and specifications, the Project can be successfully completed as bid." It claims that this language created a warranty that the plans and specifications were workable, and that the Port breached this warranty by failing to reveal the obstructions for which it had knowledge, resulting in greater expense then could have been anticipated by Traylor. The Supreme Court has determined that plans and specifications within a contract impose an implied warranty that if they are adhered to, an acceptable product will result. See United States v. Spearin, 248 U.S. 132, 137 (1918). Because Traylor admitted that it did not follow the sequence for constructing the wharf as set out in the Bid Package, the implied warranty of adequate plans and specifications is inapplicable.

C.    Changed Conditions

1.    Soil Conditions

At trial, Traylor argued that the conditions of the soil represented in the plans and specifications were materially different from that encountered during construction, [7] and, as a result, the Port was required to change the pile driving criteria, which caused substantial delay for which Traylor should be compensated.

The district court determined that it was reasonably foreseeable that Traylor would encounter varying river currents and accompanying changes in the condition of the soil. Thus, the court concluded that Traylor could not be compensated for changes in the soil for which it should have anticipated and made an allowance for when submitting its bid. Further, the court noted that even if the change in the soil was not foreseeable, Traylor failed to show that the soil conditions represented in the Bid Package were materially different from those encountered in the field and that

---

[7]The variations in the soil condition were due to the rising of the Mississippi River.

16

the pile driving criteria changes were a substantial deviation from that stated in the Bid Package.

Traylor alleges that under the contract, the Port assumed responsibility if Traylor could not comply with the specifications for reasons beyond its control. Traylor states that the required driving criteria was set out in the Bid Package and its bid was submitted with those criteria in mind. It contends that because of the significantly different soil conditions, the driving pile criteria contained in the Bid Package was unworkable. As a result, Traylor claims that the actual number of blows required to drive the piles was thirty percent higher than that represented in the contract information. It argues that not only did the change in the pile driving criteria cause delay, but the need for more hammer blows significantly impacted the equipment and the equipment's maintenance.

We agree with the district court that it was reasonablely foreseeable for a prudent bidder to anticipate encountering varying river currents and accompanying siltation problems in wharf/bridge work on the lower Mississippi river. In fact, this risk was expressly shifted to the contractor under the contract. We also find that, in any event, the conditions of the soil and the change in pile driving criteria were not substantial deviations from that described in the Bid Package. Traylor's own expert, David Huval, testified that the soil data provided in the Bid Package showed dense soil and that ninety-nine percent of the extra pile driving effort expanded on the job was due to dense soil. In addition, a representative of Lloyd Held of Eustis Engineering, the company that performed the test pile and soil programs for the Port, testified that it would not be reasonable for a contractor to assume all piles would drive exactly like the test piles. He stated that given the varying soils evidenced in the plans, it would be very difficult to drive the piles to the right tip elevation with the blow count criteria set forth in the specifications without having some modifications to the pile driving criteria. We conclude that Traylor is not entitled to compensation for de minimus changes

in the soil for which Traylor should have anticipated and made an allowance for when submitting its bid.

        2.      Pile Cut-offs

Traylor argued in the court below that it should be compensated for excessive pile cut-offs. The district court refused to grant Traylor additional compensation, finding that under the contract Traylor was responsible for the cut-offs and that its failure to allow for such cut-offs in its bid as a margin of error does not relieve it of its contractual obligation.

Contrary to the district court's determination, Traylor contends that the evidence presented at trial demonstrated that it did provide an allowance for reasonable cut-offs when submitting its bid. However, it maintains that the cut-offs were excessive due to the breach of warranty of plans and specifications and the changed conditions in the soil. This argument must fail for two reasons. First, these alleged excessive cut-offs were occasioned by the change in soil conditions. We have already determined that the soil conditions were sufficiently described in the Bid Package, and therefore, the implied warranty of adequate specifications was not breached. Furthermore, even assuming that the Port should be held liable for the alleged excessive cut-offs, Traylor has not specified how many of the piles it had to cut-off and has not produced any evidence concerning the cost of cutting an individual pile. The contract contained a provision allowing Traylor to make a written claim to the Port engineer for any additional costs it believed it incurred wit hin thirty days after sustaining the damages or additional costs. Traylor's claim was not submitted to the Port until December 12, 1996, over two years after the Project had commenced. By the time the Port received notice, it had lost its opportunity to contemporaneously track the costs and delays that Traylor alleged. See Nat Harrison Assoc., Inc., v. Gulf States Utils. Co., 491 F.2d 578, 582-83 (5th Cir. 1974) ("[T]he obvious purpose

18

of notice provisions . . . [are] to protect the owner against mistaken or fraudulent charges in the work under the contract."). Thus, we conclude that by failing to give proper notice, Traylor has forfeited its right to seek additional compensation. See Meaux v. S. Const. Corp. 159 So. 2d 156, 161 (La. Ct. App. 1964) ("The general rule in Louisiana is that a provision in a written construction contract that no claims for extra work or materials shall be allowed unless made in writing is valid and binding upon the parties, and that when the contract so provides, and there is no written order for such extras, no recovery can be had for them.").

II.     Damages

Traylor next argues that the district court erred in ruling that "even if damages were due, [Traylor's] use of the [total] cost method has not met the legal requirement for justifying the use of that method." Because we find that Traylor is not entitled to any damages, we do not reach this issue.

III.    Additional Compensation for Subcontractors

In refusing to award Traylor additional compensation, the district court also denied damages asserted by Traylor's subcontractors, which were encompassed in Traylor's request for additional compensation. The arguments raised on behalf of the subcontractor were essentially the same claims asserted by Traylor for additional costs due to extra work and delay. For the same reasons that Traylor cannot make out an equitable adjustment claim, their arguments fail as well.

**CONCLUSION**

For the reasons stated above, we AFFIRM the district court's ruling denying Traylor additional compensation.

AFFIRM.

19