United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 8, 2003**

Charles R. Fulbruge III
Clerk

REVISED APRIL 29, 2003
**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

No. 02-40165

HS RESOURCES, INC.,

Plaintiff-Appellant-Cross-Appellee,

VERSUS

JIM R. WINGATE,

Defendant-Appellee-Cross-Appellant.

Appeals from the United States District Court
For the Eastern District of Texas

Before BENAVIDES and DENNIS, Circuit Judges, and WALTER[*], District
Judge.

DENNIS, Circuit Judge.

    This declaratory judgment action concerns a dispute over
royalty payments on a highly profitable natural gas well located on

---

   [*] Senior District Judge of the Western District of Louisiana,
sitting by designation.

1

property owned by Jim Wingate and subleased to HS Resources, Inc. ("HSR").[1] Following a hearing on opposing dispositive motions, the district court entered final judgment. It denied Wingate's motion to dismiss and granted HSR's motion for partial summary judgment, declaring that HSR could pool Wingate's leased land with neighboring acreage and pay Wingate royalties on a pooled basis. Acting sua sponte, the court also held that HSR's past payments to Wingate calculated on a non-pooled basis had been made voluntarily and therefore could not be recaptured. It subsequently denied HSR's motions to amend the judgment and award attorney fees. Both parties appealed. We now AFFIRM the district court's final judgment in part, REVERSE it in part, and VACATE it in part. We further VACATE the court's denial of HSR's motion for attorney fees. Finally, we REMAND for further proceedings consistent with this opinion.

## I.

Jim Wingate owns property in Jefferson County, Texas. On May 29, 1998, he leased his undivided oil, gas, and mineral interests in six tracts of land encompassing 728.02 acres to Interstate Oil Company ("Interstate"). Under the terms of the lease ("Lease"), Wingate is entitled to receive as a royalty 25% of the market value of the natural gas produced on the leased property. The Lease

---

[1] Since the inception of this lawsuit, HSR was purchased by the Kerr-McGee Corporation. It is now known as the Kerr-McGee Rocky Mountain Corporation. For the purposes of this opinion, however, we will refer to the corporation as HSR.

2

grants Interstate (or its assigns) control of the remaining 75%. On July 17, 1998, Interstate assigned 50% of its interest under the Lease to HSR, 37.5% to Aspect Resources, LLC ("Aspect"), and 12.5% to Esenjay Exploration, Inc. ("Esenjay"). HSR operates the drilling operations on the leased property.

A.

Among other terms, Paragraph 12 of the Lease expressly grants the lessee the right to pool the leased land with adjacent tracts to form "one or more drilling or production units":[2]

> Subject to the limitations hereinafter set forth, Lessee is hereby given the power and right, . . . without Lessor's joinder or further consent, to at any time . . . pool and unitize the leasehold estate . . . with the rights of the third parties, if any, in all of the land described herein and with any other land . . . whether owned by Lessee or some other person, firm or corporation, so as to create by such pooling and unitization one or more drilling or production units, when to do so would, in the sole judgment of the Lessee, promote the conservation of oil, gas or other liquid hydrocarbons.

This right to pool is subject to a requirement that the lessee pool

---

[2] In the oil and gas lease context, "pooling" refers to the aggregation of various tracts of land for the purpose of creating a larger tract that will allow for drilling in accordance with spacing regulations and "prevent the physical and economic waste that accompanies the drilling of unnecessary wells." 6 Patrick H. Martin & Bruce M. Kramer, 6 Williams & Meyers Oil & Gas Law § 901 at 1, 3 (2001). Parties with land included in a pooled unit typically each obtain an undivided ownership interest in the royalties earned from the unit, and royalties are distributed in proportion to each parties' contributed acreage. See Southeastern Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 170 (Tex. 1999) ("The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit.").

3

all leased land:

> Lessee shall not be granted the right to pool any of the leased premises for the drilling of or production from any well located on the leased premises which is anticipated to be classified, or ultimately classified, as a "gas" well by the governmental entity having jurisdiction over same unless all of the leased premises is located either within the pooled unit for such well or within a unit for another gas well producing in commercially paying quantities from the same formation.

This paragraph also limits pooled units to 176 acres in size:

> Each such drilling or production unit shall not exceed . . . one hundred sixty (160) acres, plus an acreage tolerance not to exceed ten percent (10%) of one hundred sixty (160) acres, when created for the purposes of drilling for or producing gas from wells drilled to a depth of 10,000 feet or less.

> Paragraph 5 of the Lease allows the lessee to release those

portions of the leased land not included in producing units:

> [D]uring the primary term only, and after the discovery and production of oil, gas or other liquid hydrocarbons in paying quantities on the leased premises, Lessee shall either (1) develop the acreage retained hereunder by the drilling of additional wells at one hundred eighty (180) day intervals as hereinafter provided, (2) release those portions of the land covered hereby not included in a producing unit or units, or (3) Lessee may in lieu of such drilling or release maintain this lease in force and effect during the primary term as to any land covered hereby which is not included in a producing unit (either oil or gas) by the payment of the proportionate part of the delay rentals provided herein as to the acreage not then included in a producing unit or units.

> Finally, Paragraph 9 of the Lease allows the lessor to

terminate the Lease upon thirty days notice of the lessee's failure

to pay royalties "for any reason other than a good faith attack or

adverse claim against the title or interest of Lessor."

B.

4

On March 5, 2000, HSR completed drilling a 9,925-foot well (the "Wingate No. 1 Well") on Wingate's property. On March 22, 2000, HSR filed a unit declaration creating a pooled area described as the "HS Resources-Wingate et al Unit" ("HSR-Wingate Unit") for the purpose of gas production from the Wingate No. 1 Well.[3] The HSR-Wingate Unit consists of five tracts of land encompassing 176 acres. The declaration shows that the five tracts consist of 87.09, .89, 70.25, 16.84, and .93 acres. The record evidence shows that Wingate owns 100% of the gas rights in the 87.09- and .89-acre tracts; 20% of the gas rights in the 70.25-acre tract (i.e., 14.05 net acres); 40% of the gas rights in the 16.84-acre tract (i.e., 6.74 net acres); and 0% of the .93-acre tract. Thus, although he owns 175.07 acres of the land included in the HSR-Wingate Unit, his contribution to the unit amounts to only 108.77 net acres when his gas rights in those 175.07 acres are considered. In other words, Wingate controls only 61.8% of the gas produced by the unit.[4]

On March 29, 2000, Wingate objected to the formation of the HSR-Wingate Unit, claiming it violated the terms of the Lease because it did not incorporate all his leased property. The Wingate No. 1 Well began producing gas on April 24, 2000. On May 2, 2000, HSR, Aspect, and Esenjay filed a release of all land

[3] This declaration was executed on September 14, 1999, but it was not filed in the Jefferson County, Texas, clerk's office until March 22, 2000.

[4] Wingate states without any evidentiary support that only 87.09 acres of his land is included in the unit.

5

leased from Wingate that was not included in the HSR-Wingate Unit. On the same day, HSR filed a supplemental unit declaration confirming the HSR-Wingate Unit.

On May 4, 2000, Wingate sued HSR in Texas state court ("State Lawsuit"), asserting that the formation of the HSR-Wingate Unit was invalid under the terms of the Lease. After he filed the State Lawsuit, but not as a part of it, Wingate demanded HSR pay him royalties on the Wingate No. 1 Well as if the well were not part of a pooled unit. The difference in the calculation of royalties is significant: payment on a non-pooled basis amounts to 25% of the market value of all the gas produced by the well, whereas payment on a pooled basis amounts to 25% of the gas attributed to his 61.8% stake in the HSR-Wingate Unit. Wingate threatened to terminate the Lease if HSR refused to pay him on a non-pooled basis. Faced with this threat, HSR sent Wingate a check for $1,283,309.31, which included royalties calculated on a non-pooled basis plus interest. A letter accompanying the check clearly stated that HSR was paying the amount under protest and reserved its right to sue for overpayment if the Lease was determined to allow pooling.[5] Wingate subsequently entered into a settlement agreement and covenant not to sue with Aspect and Esenjay. Wingate voluntarily dismissed the State Lawsuit on January 2, 2001.

HSR thereafter paid Wingate royalties on a non-pooled basis as

---

[5] HSR contends it overpaid Wingate in excess of $800,000.

to its interest and on a pooled basis as to Aspect's and Esenjay's interests. Wingate again threatened to terminate the Lease if he was not paid solely on a non-pooled basis. HSR then began to pay royalties, again under protest, on a non-pooled basis as to the entire lease.

On May 18, 2001, HSR sued Wingate in federal court, seeking (1) a declaration that pooling was proper under the terms of the Lease, (2) the recapture of its past payments to Wingate in excess of royalties calculated on a pooled basis, and (3) attorney fees. In response to HSR's complaint, and instead of filing an answer, Wingate moved to dismiss pursuant to Rule 12 (b)(1), (6), and (7) of the Federal Rules of Civil Procedure, arguing that HSR had failed to join the other parties with property interests in the HSR-Wingate Unit. HSR moved for partial summary judgment on the limited question of whether the Lease allowed pooling. Wingate responded to HSR's motion but still did not file an answer. HSR also moved for a preliminary injunction ordering Wingate to set aside the money at issue in the recapture claim.

The district court heard arguments on the parties' dispositive motions but not on HSR's motion for a preliminary injunction. It subsequently denied Wingate's motion to dismiss, concluding that "the other members of the Wingate Unit do not have a stake in this litigation, and the plaintiff is not required to join them." It simultaneously granted HSR's motion for partial summary judgment, holding that the Lease allowed for pooling and payment of royalties

7

on a pooled basis. Acting on its own initiative, the court also held that HSR's $1,283,309.31 payment was voluntary and could not be recaptured. Finally, it dismissed HSR's preliminary injunction motion as moot based on its recapture ruling.

HSR moved the district court to amend the judgment as to its recapture claim, offering evidence supporting its argument that its payments on a non-pooled basis had been made under protest and were not voluntary. HSR also moved for $169,164.44 in attorney fees. Wingate untimely moved the court to amend the judgment. The district court denied HSR's post-judgment motions without discussion. It altogether ignored Wingate's post-judgment motion. These appeals followed.

## II.

We face three issues. First, Wingate challenges the district court's denial of his motion to dismiss. Next, both parties challenge different aspects of the court's summary judgment decision. Finally, HSR challenges the court's denial of its motion for attorney fees.

## A.

Wingate moved pursuant to Rule 12(b)(7) to dismiss HSR's lawsuit for failure to join the other owners of land and gas interests in the HSR-Wingate Unit ("Royalty Owners"). Rule 12(b)(7) allows dismissal for "failure to join a party under Rule

19."[6] Rule 19 provides for the joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue.[7] It further provides for the dismissal of litigation that should not proceed in the absence of parties that cannot be joined.[8] We review "a district court's decision to dismiss for failure to join an indispensable party [under Rule 19] . . . under an abuse-of-discretion standard."[9] We therefore review the district court's denial of Wingate's Rule 12(b)(7) motion for abuse of discretion.

Rule 12(b)(7) analysis entails two inquiries under Rule 19. The court must first determine under Rule 19(a) whether a person should be joined to the lawsuit. If joinder is warranted, then the person will be brought into the lawsuit. But if such joinder would destroy the court's jurisdiction, then the court must determine under Rule 19(b) whether to press forward without the person or to

---

[6] Fed. R. Civ. P. 12(b)(7).

[7] Fed. R. Civ. P. 19(a); Pulitzer-Polster v. Pulitzer, 784 F.2d 1305, 1308 (5th Cir. 1986) ("The federal rules seek to bring all persons that may have an interest in the subject of an action together in one forum so that the lawsuit can be fairly and completely disposed of. In accord with this goal, Rule 19 seeks to bring into a lawsuit all those persons who ought to be there by requiring joinder" (citations omitted)).

[8] Fed. R. Civ. P. 19(b); Pulitzer-Polster, 784 F.2d at 1308.

[9] Pulitzer-Polster, 784 F.2d at 1309 (explaining that "Rule 19's emphasis on a careful examination of the facts means that a district court will ordinarily be in a better position to make a Rule 19 decision than a circuit court would be.").

9

dismiss the litigation.[10]  Factors to consider under Rule 19(b) include "(1) prejudice to an absent party or others in the lawsuit from a judgment; (2) whether the shaping of relief can lessen prejudice to absent parties; (3) whether adequate relief can be given without participation of the party; and (4) whether the plaintiff has another effective forum if the suit is dismissed."[11]

In this case, the district court correctly determined that the other Royalty Owners need not be joined.  In the context of litigation over one lessor's contribution to a pooled unit, the presence of the other lessors is not required unless the judgment "effectively precludes them from enforcing their rights and they are injuriously affected by the judgment."[12]  In this case, joinder of the other Royalty Owners was not warranted because the leases they entered into with Interstate required that they be paid royalties on a pooled basis regardless of whether the unit was determined to be valid or invalid as to any other owner.  Our review of these leases, which are included in the record, supports the district court's conclusion.  Accordingly, we agree that the

---

[10] Id.; see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1359, at 425 (2d ed. 1990).

[11] Cornill Ins. PLC v. Valsamis, Inc., 106 F.3d 80, 84 (5th Cir. 1997) (citing Fed. R. Civ. P. 19(b)); see also 5A Wright & Miller, Federal Practice & Procedure § 1359, at 426 ("The burden is on the moving party to show the nature of the unprotected interests of the absent parties.").

[12] Hilton v. Atlantic Refining Co., 327 F.2d 217, 219 (5th Cir. 1964).

outcome of this litigation will not affect—let alone adversely affect—the rights of other Royalty Owners.[13] The district court did not abuse its discretion in denying Wingate's motion to dismiss.[14]

B.

Both parties challenge aspects of the district court's grant of summary judgment. Wingate contends that the ruling was premature and, in any event, improperly concluded that the HSR-Wingate Unit was valid under the Lease and that HSR owed royalties only on a pooled basis. HSR argues that the court improperly found that its prior payments of royalties to Wingate calculated on a

---

[13] We reject Wingate's argument that the doctrine of cross-conveyance requires joinder. See Veal v. Thomason, 159 S.W.2d 472, 476-77 (Tex. 1942) (holding that a party's contribution to a pooled unit effectively conveys an undivided interest in the party's royalties to each of the other contributors, such that all the contributors' interests are at stake in a lawsuit concerning any one contribution to the unit); see also 6 Martin & Kramer, Williams & Meyers Oil & Gas Law § 930.8, at 576-79 (discussing the cross-conveyance doctrine under Texas law). As the district court correctly determined, the language of the Lease places this case squarely within the exception to the doctrine outlined in Southland Royalty Company v. Humble Oil & Refining Company, 249 S.W.2d 914, 916-17 (Tex. 1952) (allowing parties to avoid the cross-conveyance of interests by contract). Furthermore, the Texas cases Wingate cites in support of his position predate the revision of Rule 39 of the Texas Rules of Civil Procedure, which brought the Texas rule in line with Rule 19 of the Federal Rules. To the extent that Veal and its progeny previously would have required joinder under the cross-conveyance doctrine, they have been superseded by the revision of Texas' Rule 39. See Sabre Oil & Gas Corp. v. Gibson, 72 S.W.3d 812, 816 (Tex. App. 2002) ("Although [the other royalty owners] had an interest in that their share of the production from the pooled unit would be affected, [their] presence . . . was not necessary to determine [the issues of the case].").

[14] Because the other Royalty Owners are not indispensable parties, there was no basis on which to dismiss under Rule 12(b)(1) or (b)(6).

11

non-pooled basis were voluntary and could not be recaptured.

1.

We review a grant of summary judgment de novo, applying the same standard as below.[15] Summary judgment is appropriate only if the movant demonstrates that there are no genuine issues of material fact and that it is entitled to a judgment as a matter of law.[16] We likewise review matters of contract interpretation de novo.[17] "We will not set aside a district court's factual findings, unless they are clearly erroneous."[18]

2.

As we stated above, Wingate moved to dismiss in lieu of filing an answer to HSR's complaint. Wingate complains that the district court's simultaneous denial of his motion and grant of summary judgment for HSR on the contract interpretation issue prevented him from filing an answer to HSR's complaint. In essence, he contends that the court denied him notice before entering final judgment. This claim of error is meritless. Rule 56 permits a motion for summary judgment to be made "at any time after the expiration of 20 days from the commencement of the action or after service of a

---

[15] GeoSouthern Energy Corp. v. Chesapeake Operating Inc., 274 F.3d 1017, 1020 (5th Cir. 2001).

[16] Fed. R. Civ. P. 56(c).

[17] T.L. James & Co. v. Traylor Bros., Inc., 294 F.3d 743, 746 (5th Cir. 2002).

[18] Id. (quotations and citations omitted).

12

motion for summary judgment."[19]   Hence, an answer is not a prerequisite to the consideration of a motion for summary judgment.[20]   Furthermore, the record shows that Wingate responded to HSR's motion for partial summary judgment and appeared at the hearing on the parties' respective motions.   Given these facts, Wingate had clearly made an appearance in the suit and therefore was not denied notice or an opportunity to be heard before the entry of final judgment.[21]   Accordingly, the district court did not err in deciding HSR's motion for partial summary judgment at the same time it disposed of Wingate's motion to dismiss.

3.

HSR raises a somewhat similar complaint, arguing that the district court deprived it of an opportunity to be heard before granting summary judgment for Wingate on the question of whether it could recapture the royalty payments it had made on a non-pooled basis.   Unlike Wingate's complaint, however, HSR's complaint concerns the court's resolution of an issue that neither party had yet asked it to resolve.

A district court may enter summary judgment sua sponte so long

---

[19] Fed. R. Civ. P. 56(a).

[20] See First Am. Bank, N.A. v. United Equity Corp., 89 F.R.D. 81, 87 (D.D.C. 1981).

[21] See Jones v. Sheehan, Young & Culp, 82 F.3d 1334, 1340 (5th Cir. 1996) ("In determining whether conduct is sufficient to be considered a general appearance, the focus is on affirmative action that impliedly recognizes the court's jurisdiction over the parties.").

13

as the losing party has notice and an opportunity to come forward with evidence.[22]  This requirement follows from the rule that a motion for summary judgment "shall be served at least 10 days before the time fixed for the hearing."[23]  The purpose of such a requirement is self-evident: it "enables the non-movant to place all the evidence supporting its position into the record so that a reviewing court can decide whether the non-movant has demonstrated the existence of a genuine dispute regarding a material fact."[24]  We have stated that any "reasonable doubts" about whether a non-movant received notice must be resolved in favor of that party.[25]

In this case, the record clearly shows that HSR had neither notice nor an opportunity to present evidence before the district court held that it had voluntarily made the disputed royalty payments and that it could not recapture anything from Wingate.

---

[22] _Celotex Corp. V. Catrett_, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments _sua_ _sponte_, so long as the losing party was on notice that she had to come forward with all of her evidence."); _Arkwright-Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp._, 932 F.2d 442, 445 (5th Cir. 1991) ("[D]istrict courts can definitely grant summary judgment _sua_ _sponte_, upon proper notice to the adverse party."); _see also_ 10 C. A. Wright, A. Miller, & M. Kane, _Federal Practice and Procedure_ § 2720, at 28-29 (1983); 11 James Wm. Moore et al., _Moore's Federal Practice_ § 56.10[2][b], at 56-49.

[23] Fed. R. Civ. P. 56; _see also_ _Baloqun v. I.N.S._, 9 F.3d 347, 352 (5th Cir. 1997) ("When granted _sua_ _sponte_, summary judgment is governed by Rule 56's requirement of ten days notice and an opportunity to respond.").

[24] _NL Indus., Inc. v. GHR Energy Corp._, 940 F.2d 957, 965 (5th Cir. 1991).

[25] _See_ _id._

14

The first time the specter of the voluntariness of HSR's payment arose was during the hearing on the parties' dispositive motions, and even then it was mentioned only in passing by the court. We find that the court's fleeting comment did not provide sufficient notice to HSR that it intended to dispose of the recapture issue. More to the point, the court afforded HSR no opportunity to present evidence on the recapture issue before it ruled. Accordingly, we hold that the district court's recapture ruling was erroneous.

In order to smooth the way on remand, we turn briefly to the law controlling the issue of whether HSR's payments to Wingate were voluntary. The district court's ruling rested on an incomplete statement of this law. It is true that money voluntarily paid cannot be recovered in the absence of fraud, duress, or compulsion.[26] It is also true that "[this] rule applies even though the payor protests at the time against his liability."[27] But "what constitutes a voluntary payment depends upon whether the facts in a particular case indicate an intention on the part of the payor to waive his rights."[28] For example, "a payment made with a

---

[26] Arkwright-Boston, 932 F.2d at 447 ("'[M]oney voluntarily paid with full knowledge of all of the facts . . . cannot be recovered back, although it was paid upon a void or illegal demand or upon a claim which had no foundation in fact and was paid without consideration.'" (quoting Tyler v. Tyler, 742 S.W.2d 740, 743 (Tex. App. 1987))).

[27] West Tex. State Bank v. Tri-Service Drilling Co., 339 S.W.2d 249, 253 (Tex. App. 1960).

[28] Id.; see also Arkwright-Boston, 932 F.2d at 447; Spring Branch Bank v. Mengden, 628 S.W.2d 130, 136 (Tex. App. 1981).

15

reservation of the right to bring suit for recovery is not a voluntary payment."[29]  Accordingly, it would appear that HSR's payments to Wingate may be recoverable as having been involuntarily made.[30]  Whether HSR intended to waive its overpayment claim, however, is a question best left to be answered on remand.[31]

4.

As we explained above, the district court declared that the Lease allowed HSR to pool Wingate's land with that of adjacent property owners to create the HSR-Wingate Unit.  Wingate attacks this ruling from two angles.  First, he argues that it is contrary to the express terms of the Lease.  Second, he argues that the HSR-Wingate Unit was formed in bad faith.  We reject both arguments.

Under Texas law, oil and gas leases are interpreted like other contracts.[32]  Our job in construing unambiguous lease terms is to "ascertain the parties' intentions as expressed in the lease."[33]

_____

[29] West Tex. State Bank, 339 S.W.2d at 253.

[30] Furthermore, it follows from the law we have cited that the question of whether a payment was made under duress, fraud, or compulsion will arise only if the payor cannot prove its payments were involuntary.  Spring Branch Bank, 628 S.W.2d at 137 ("Only if plaintiff does not succeed in proving involuntary payment or lack of intent to waive must he plead and prove duress, fraud or compulsion in order to recover.").

[31] Based on our holding, we need not consider whether the district court erred in denying HSR's motion to amend judgment.

[32] Sabre Oil & Gas, 72 S.W.3d at 816.

[33] Id. at 816-17 (citing Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)).

16

We must determine the meaning of a given part within the context of the entire lease, so that the sections harmonize with one another.[34]

"A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause. For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease."[35] Wingate argued below that the Lease prevented HSR from pooling unless it pooled all 728 acres within either the pooled unit (i.e., the Wingate Well Unit) or within another commercially producing unit. The district court rejected this argument. It interpreted the Lease's authorization of pooling to be limited by the provision that required pooled units to be no larger than 176 acres, and it interpreted the Lease to allow HSR to release those portions of the leased acreage not included in a producing unit. Reading these provisions together, the court stated, "if the contract is harmonized, and the pooling provision is read in conjunction with the release provision, there is no discrepancy or ambiguity."[36] After careful study of the document, we agree with this reading of the Lease and adopt it as our own. Wingate's proposed reading of the Lease is internally inconsistent, at once recognizing that the Lease allows pooling but requiring any pooled unit to include all

---

[34] Id. at 817 (citing Heritage Resources, 939 S.W.2d at 121).

[35] Southeastern Pipe Line, 997 S.W.2d at 170.

[36] District Court Opinion at Bates 146 (citing Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).

17

728 acres of leased land—something that is expressly disallowed by other Lease provisions.

Wingate's second tack provides for no smoother sailing. "A lessee's pooling decision will be upheld unless the lessee pools in bad faith."[37] The consequence of bad-faith pooling is that "production will be considered to take place only on the actual tract upon which it occurs."[38] Wingate asserts that there is a genuine issue of material fact as to whether HSR's pooling decision was made in bad faith. In particular, Wingate argues that HSR acted in bad faith by releasing the unpooled land only after the Wingate Well started producing. This argument is meritless. The release provision clearly required HSR, after the discovery and production of gas, either to develop the leased acreage by drilling additional wells at 180-day intervals or to release those portions of the land not included in a producing unit. HSR declared the Wingate Well Unit on March 22, 2000.[39] The Wingate Well began producing on April 24, 2000. HSR released the unpooled land on May 2, 2000. Hence, under the plain terms of the release provision, HSR properly released the unused land within 180 days of production. Indeed, it did so within about two weeks of

---

[37] Southeastern Pipe Line, 997 S.W.2d at 170.

[38] Id.

[39] Wingate attempts to make hay out of the fact that HSR executed the HSR-Wingate Unit declaration on September 14, 1999. But that declaration was not effective until it was filed on March 22, 2000.

18

production. Under these facts, HSR's actions simply do not constitute bad faith. Because Wingate identifies no evidence to the contrary, we conclude that there is no genuine issue of material fact on the question of bad faith.

We hold that the district court correctly determined that HSR had authority under the Lease to pool and, therefore, that the district court correctly declared that HSR owed Wingate royalties on a pooled basis.

### C.

Finally, HSR contends that the district court erred in denying it attorney fees pursuant to both the terms of the Lease and Texas law.[40] Because our holding requires that we remand for further proceedings, the issue of attorney fees will need to be revisited. Accordingly, we vacate the court's order regarding attorney fees. We further instruct the court to provide reasons for its decision regarding such fees when it takes up the issue on remand.[41]

### III.

For the foregoing reasons, we AFFIRM the district court's final judgment in part, REVERSE it in part, and VACATE it in part. In particular, we AFFIRM the court's denial of Wingate's motion to

---

[40] Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1986).

[41] See Schwarz v. Folloder, 767 F.2d 125, 131 (5th Cir. 1985) ("[T]he trial court must give reasons for its decisions regarding attorney fees; otherwise, we cannot exercise meaningful review.").

19

dismiss; AFFIRM its grant of summary judgment that the Lease allows pooling and provides for payment of royalties on a pooled basis; REVERSE its <u>sua</u> <u>sponte</u> grant of summary judgment that HSR cannot recapture its payments to Wingate made on a non-pooled basis; and VACATE its dismissal of HSR's motion for preliminary injunction. We further VACATE the court's denial of HSR's motion for attorney fees.  Finally, we REMAND for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED.